IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

AARON HARRELL,                    )
                                  )
        Plaintiff,                )
                                  )
v.                                )  CIVIL ACTION NO. 2:13-00056-N
                                  )
CAROLYN COLVIN, Acting            )
Commissioner of Social Security,[1]  )
                                  )
        Defendant.                )

ORDER

Plaintiff, Aaron Harrell, brings this action seeking judicial review of a final

decision of the Commissioner of Social Security denying his application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under

Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401-433 and 1381-

1383c. Pursuant to the consent of the parties (doc. 19), this action has been referred to the

undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment

in accordance with 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73. *See* Doc. 21.  The matter

came on for oral arguments on September 26, 2013, at which William T. Coplin , Jr.

appeared for the plaintiff and Assistant United States Attorney Patricia Beyer represented

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted
for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit by
reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

the Commissioner.  Upon consideration of the administrative record (doc. 11), the

parties' respective briefs (Docs. 13, 16), and the parties' respective arguments, the

undersigned concludes that the decision of the Commissioner is **REMANDED** for proper

consideration of Dr. Blanton's opinion, unless the ALJ on remand determines that Harrell

ought to be examined by an agency medical expert and submit to further testing.

I.    Procedural History.

Although Harrell's actual applications were not available for inclusion in the

record (doc. 16 at n.2), the record indicates that plaintiff filed his applications for DIB

and SSI benefits on January 29, 2010 (Tr. 50, 51).   Harrell claimed a disability onset of

January 1, 2006 due to ulcers and body pain (Tr. 27, 52, 53, 139).  He was initially denied

on July 30, 2010 (Tr. 52-63).  A hearing before the Administrative Law Judge (ALJ) was

held on August 10,  2011 (Tr. 25-49).  An unfavorable decision was issued by the ALJ on

September 8, 2011, on the grounds, in sum, that Harrell could perform a range of light

work existing in significant numbers in the national economy (Tr. 10-24).

The Appeals Council denied Harrell's request for review of the ALJ's decision on

December 15, 2012 (Tr. 1-6), making the ALJ's decision the Commissioner's final

decision for purposes of judicial review.  See 20 C.F.R. § 422.210(a).[2]  Harrell now

timely appeals from that decision and all administrative remedies have been exhausted.

---

[2] All citations to the Code of Federal Regulations (C.F.R.) are to the 2013 edition.

II.     Issues on Appeal.

A.     Whether the ALJ erred in rejecting the opinion of Harrell's retained examining consultant, Donald W. Blanton, Ph.D.?

B.     Whether the ALJ erred by failing to find that Harrell is disabled under Listing 12.05C?

III.     Standard of Review.

A.     Scope of Judicial Review.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one.  Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004) (*per curiam*); Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2001); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400;  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).  Substantial evidence is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *See* Richardson v. Perales, 402 U.S. 389, 401 (1971); Crawford, 363 F.3d at 1158; Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).

Substantial evidence "is more than a scintilla, but less than a preponderance," Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005). *See also*, Martin, 894 F.2d at 1529 ("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ's decision will not be overturned where "there is substantially supportive evidence" of that decision. Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).

The ALJ is responsible for determining a claimant's RFC, an ingrained principle of Social Security law. *See* 20 C.F.R. § 416.946(c) ("If your case is at the administrative law judge hearing level under § 416.1429 or at the Appeals Council review level under § 416.1467, the administrative law judge or the administrative appeals judge at the Appeals Council (when the Appeals Council makes a decision) is responsible for assessing your residual functional capacity.") "Residual functional capacity, or RFC, is a medical assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." Peeler v. Astrue, 400 Fed.Appx. 492, 493 n. 2 (11th Cir. Oct.15, 2010), *citing* 20 C.F.R. § 416.945(a). *See also*, Hanna v. Astrue, 395 Fed.Appx. 634, 635 (11th Cir. Sept.9, 2010) ("A claimant's RFC is 'that which [the claimant] is still able to do despite the limitations

caused by his ... impairments.'")(*quoting* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir.2004). "In making an RFC determination, the ALJ must consider all the record evidence, including evidence of non-severe impairments." Hanna, 395 Fed.Appx. at 635 (citation omitted); *see also* 20 C.F.R. § 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."); 20 C.F.R. § 416.945(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence."). The regulations provide, moreover, that while a claimant is "responsible for providing the evidence [the ALJ] ... use[s] to make a[n][RFC] finding[,]" the ALJ is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary," and helping the claimant get medical reports from her own medical sources. 20 C.F.R. § 416.945(a)(3). In assessing RFC, the ALJ must consider any statements about what a claimant can still do "that have been provided by medical sources," as well as "descriptions and observations" of a claimant's limitations from her impairments, "including limitations that result from [ ] symptoms, such as pain[.]" *Id.*

In determining a claimant's RFC, the ALJ considers a claimant's "ability to meet the physical, mental, sensory, or other requirements of work, as described in paragraphs (b), (c), and (d) of this section." 20 C.F.R. § 416.945(a)(4).

> (b) Physical abilities. When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural

functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

(c) Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

(d) Other abilities affected by impairment(s). Some medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment(s), we consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.

20 C.F.R. § 416.945(b), (c) & (d).  *See also* <u>Kennedy v. Astrue</u>, 2012 WL 2873683, * 7-8 (S.D. Ala. July 13, 2012).

B.     <u>Statutory and Regulatory Framework</u>.

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See*

42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. Patterson v. Bowen, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must prove "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010). The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id.* It also can contain both exertional and nonexertional limitations. *Id*. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"), or hear testimony from a vocational expert (VE). <u>Id</u>. at 1239–40.

C.  Listing 12.05(C).

Unlike the other mental disorders listings in the regulations, Listing 12.05 contains an introductory paragraph, or a "diagnostic description," with criteria the claimant must meet in addition to meeting one of the "four severity prongs" for mental retardation.  *See* <u>Randall v. Astrue</u>, 570 F.3d 651, 659-60 (5th Cir. 2009); <u>Wall v. Astrue</u>, 561 F.3d 1048, 1062 (10th Cir. 2009); <u>Novy v. Astrue</u>, 497 F.3d 708, 709 (7th Cir. 2007); <u>Maresh v. Barnhart</u>, 438 F.3d 897, 899 (8th Cir. 2006); <u>Foster v. Halter</u>, 279 F.3d 348, 354 (6th Cir. 2001).  The Eleventh Circuit has recognized the distinction with respect to Listing 12.05 as follows:

> Listing 12.05, the listing category for mental retardation, begins with an introductory paragraph, which states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05. The listing further provides that the "required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied." *Id.* Subsection C requires a claimant demonstrate "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* at § 12.05(C). Section 12.00A states in pertinent part that "[l]isting 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing." *Id.* at § 12.00A (emphasis added).

> We have determined that, to be considered for disability benefits under Listing 12.05, a claimant must at least (1) have significantly subaverage general

intellectual functioning; (2) have deficits in adaptive functioning; and (3) have manifested deficits in adaptive behavior before age 22. Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997). In addition, for presumptive disability under 12.05C, the claimant must have (1) a valid IQ score of 60 through 70 inclusive, and (2) an additional mental or physical impairment significantly affecting the claimant's ability to work. *Id.* at 1219-1220.

Pettus v. Astrue, 226 Fed. Appx. 946, 948 (11th Cir. Apr. 5, 2007). In Humphries v.

Barnhart, the Eleventh Circuit held:

Here, substantial evidence supports the ALJ's finding that Humphries' impairments do not meet or equal the Listing 12.05(C) because, despite her IQ of 65, she does not have deficits in her adaptive functioning. Humphries worked in a school cafeteria for 21 years, and served as the manager for about 15 years. As manager, Humphries gave the five employees under her supervision daily lists of tasks, ensured breakfast and lunch were prepared on time, and ordered groceries for the cafeteria.

183 Fed. Appx. 887, 890 (11th Cir. June 8, 2006). A rebuttable presumption exists that

any claimant who has demonstrated a valid IQ score under 70 has also "manifested

deficits in adaptive functioning before the age of 22" and therefore satisfies the criteria

for Listing 12.05(C); the presumption must then be rebutted by the Commissioner with

evidence that, despite a valid IQ score of 60 through 70, the claimant does not have

deficits in adaptive functioning. Grant v. Astrue, 255 Fed. Appx. 374, 375 (11th Cir. Nov.

13, 2007). *See also* Frank v. Astrue, 2011 WL 6111692, *2-4 (S.D. Ala. Dec. 8,

2011)("[T]he law in this Circuit is clear that where, as here, a claimant has presented a

valid IQ score of 60 to 70, she is entitled to the presumption that she manifested deficits

in adaptive functioning before the age of 22 [and] [t]o establish a disability under section

12.05(C), a claimant must present evidence of a valid verbal, performance, or full-scale

I.Q. score of between 60 and 70 inclusive, and of a physical or other mental impairment imposing additional and significant work-related limitation of function.").

The second prong of Listing 12.05(C) requires evidence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  Etheridge v. Astrue, 2009 WL 3233899, *10 (S.D. Ala. Sept. 29, 2009).  This once meant that the "work-related limitation of function" must be "significant," but it need not be a "severe impairment" as defined at Step 2.  However, as explained in Black v. Astrue, 678 F.Supp.2d 1250, 1262 (N.D. Ala. 2010):

> Under an earlier version of this Listing, our circuit interpreted this as something that is "significant" but less than a "severe impairment" as defined at Step 2. Edwards by Edwards v. Heckler, 755 F.2d 1513, 1515 (11th Cir.1985) (emphasis added). But (citation omitted), this was modified in 2000 and the introductory paragraph of Listing 12.00 now equates this criterion with a "severe" impairment as intended at step 2 and governed by 20 C.F.R. §§ 404.1520(c) and 416.920(c).

678 F.Supp.2d at 1262.  Consequently, the claimant must do more than merely cite to an ALJ's finding that a particular condition is a "severe impairment" for purposes of Step 2 of the sequential evaluation.

Listing 12.05(C) requires a claimant to demonstrate "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  Pettus, 226 Fed. Appx. at 948.  In order to determine the severity of a mental impairment within the context of 12.05(C), the Commissioner is required, at all levels of the administrative process, to apply the "special technique" of review set forth in 20 C.F.R. §§ 404.1520a and 416.920a.  Taylor v. Astrue, 2009 WL 5184402, *3 (M.D. Ala. Dec. 23, 2009), *citing*

Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007), and Binion v. Astrue, 2008 WL

4493238 (M.D. Ala. Oct. 3, 2008).  This "special technique" is described as follows:

> Under the "special technique," after determining whether or not the claimant
> suffers from some mental impairment(s), the Commissioner then rates the degree
> of functional limitation resulting from the impairment(s). The Commissioner rates
> the degree of limitation imposed in four distinct "functional areas" including:
> "activities of daily living; social functioning; concentration, persistence, or pace;
> and episodes of decompensation." § 404.1520a(c)(3). The Commissioner uses a
> five-point scale (none, mild, moderate, marked, and extreme) in rating the first
> three functional areas, and a four-point scale (none, one, two, three, and four or
> more) in rating episodes of decompensation. If the degree of limitation found in all
> of the first three areas is "none" or "mild," and there are no periods of
> decompensation, then the Commissioner will generally find the impairment not
> severe. 20 C.F.R. § 1520a(d)(1). If the ALJ's scoring of the claimant's limitations
> compels a finding that the claimant's mental impairment(s) is severe, the ALJ then
> proceeds to determine "if it meets or is equivalent in severity to a listed mental
> disorder." § 1520a(d)(2).
>
> The Commissioner is required to document his application of the special review
> technique at all stages in the administrative adjudication of a disability claim. 20
> C.F.R. § 1520a(e). During the initial stages of review, application of the "special
> technique" is facilitated by the completion of a Psychiatric Review Technique
> Form ("PRTF") by a qualified professional. During review by the ALJ, the ALJ is
> required "to complete a PRTF and append it to the decision, or incorporate its
> mode of analysis into [the ALJ's] findings and conclusions. Failure to do so
> requires remand." Moore v. Barnhart, 405 F.3d 1208, 1214 (11th Cir. 2005).
> Importantly, the ALJ is required to document his or her application of the
> technique as to each of the given functional areas, and failure to do so precludes
> judicial review of the ALJ's decision. Id. Failure to properly apply the special
> review technique requires remand even if the ALJ's ultimate finding that the
> claimant is not disabled is supported by substantial evidence. *Id. See also* Binion,
> 2008 WL 4493238 at *4.

Taylor, 2009 WL 5184402 at *3-4.  In other words, the mere existence of physical or

mental impairments, even if supported by sufficient medical evidence, does not reveal the

extent to which they limit claimant's ability to work or undermine an ALJ's

determination in that regard.  "[T]he 'severity' of a medically ascertained disability must

be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." Russell v. Astrue, 331 Fed.Appx. 678, 681 (11th Cir. Jun. 15, 2009), *quoting* McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). Such is the purpose of the "special technique" described above, which "requires separate evaluations on a four-point scale of how the claimant's mental impairment impacts four functional areas: "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation" and must be incorporated in the ALJ's findings and conclusions. Moore, 405 F.3d at 1213-14, *citing* 20 C.F.R. §§ 404.1520a-(c)(3-4) and (e)(2).

IV.  Findings of Fact and Conclusions of Law.

A.  Statement of Facts.

1.  Vocational Background.

Harrell was born on September 15, 1958, and was 47 years old on his alleged onset date, and 52 years old on the date on which the ALJ issued her opinion (Tr. 104). The disability report reflects that Harrell completed the 12th grade in May of 1977 and did not attend special education classes (Tr. 140). This report also indicates that Harrell could read and understand English (Tr. 138). This typed report has not been signed by Harrell and does not indicate who prepared the report (Tr. 145). It does, however, appear to be part of the Disability Report prepared by the Social Security Field Office (Tr. 134-137) prepared by a Field Office employee, E. Clark, on February 11, 2000 (Tr. 137).

At the hearing, Harrell initially testified that he went to the 11th grade in school, but then conceded that it might have been just the ninth grade (Tr. 40).[4]  Harrell's school records show that Harrell attended R.C. Hatch High School.  In the 7th grade, he received the grade of "S" in all classes except English, in which he received a "U".  In the 8th grade, he made "A" in music, "D" in social studies, and "F" in English, math and science, but was promoted to the 9th grade.  In the two semesters of 9th grade, he made "C" and "D" respectively in physical education, "D" in social studies, and "F" in English and science.  He repeated the 9th grade and made "F" in algebra and "0" in English, social studies, science, physical education and biology.  (*See*, Tr. 168-169).

Harrell was last employed cutting grass at golf course for 5-6 years, which was unskilled work as performed, according to the vocational expert who testified in this case (Tr. 32, 43).  Although the record may show "a significant work history from 1975 to 2005 in the unskilled category" (Tr. 18), the most Harrell ever made was $14,790.75 in 1990.  *See*, Tr. 116 (sets forth Harrell's annual earnings for 1975 to 2005).[5]

---

[4] In the report of Donald W. Blanton, Ph.D., it is also reported that Harrell "stopped school in the eleventh grade and never obtained a GED" (Tr. 282). Dr. Blanton does not indicate that he had access and reviewed any of Harrell's school records.  He does, however, opine that Harrell "was not a particularly good historian" with respect to his own history of illness (Tr. 281).

[5] In 1975, he only earned $64. The next year he earned $182.10; then $658.46 in 1977. Thereafter, it was not until 1985 that his earnings rose to a high of $5,858.54.  His annual salary exceeded $10,000 in only six of these "many years" of unskilled work, which included $10,021.08 in 1989, $14,790.75 in 1990 (followed by a drop to $1,116 in 1991, only $673.76 in 1992 and $4,762.56 in 1993), $10,225.49 in 1994 (following by income ranging from $3,281.55 to $7,668.22 between 1995 and 1999), $11,906.17 in 2000, $11,846.52 in 2001 and $10,906.25 in 2002.  The last three years in which he was employed, he earned $280.43 in 2003, $43.75 in 2004, and $2,770.44 in 2005.  (Tr. 116).

2.    <u>Medical Evidence</u>.

From May 2-5, 2004, Harrell was hospitalized for "infective gastroenteritis" (inflammation of the lining of the intestines caused by a virus, bacteria, or parasites)[6] (Tr. 172-85). The admitting physician, Akhtar Jamil, M.D., noted that Harrell had previously had surgery for a perforated ulcer in 1992, which involved a partial gastrectomy (surgical removal of all or part of the stomach)[7] (Tr. 172). Harrell was found, on testing, to have renal salt wasting (inappropriate loss of sodium in the urine)[8] (Tr. 172). Harrell received IV fluids and "gradually his sodium [level] improved" (Tr. 172). He also received anti-biotic medications, which were continued after discharge, and he improved (Tr. 173). During this hospitalization, Harrell was also seen by Charles L. Lett, M.D., who performed an "upper GI Endoscopy" (Tr. 176)[9] to rule out "active peptic ulcer disease and gastrointestinal bleeding" (Tr. 175). Dr. Lett noted that Harrell suffered from "gastritis" but found no bleeding or ulcerations (Tr. 176).

Harrell was treated on a number of occasions for abdominal pain and cramps between December 8, 2008 and June 1, 2010 (Tr. 209-211, 215-220, 250-261, 267-272, 278-279). In addition, treatment notes dated November 17, 2009, indicate that Harrell

---

[6] *See*, http://www.medical-dictionary.thefreedictionary.com/Gastroenteristis.

[7] *See*, http://www.medical-dictionary.thefreedictionary.com/gastrectomy.

[8] *See*, http://www.medical-dictionary.thefreedictionary.com/salt+wasting.

[9] "An upper gastrointestinal (UGI) endoscopy is a procedure that allows your doctor to look at the interior lining of your esophagus, your stomach, and the first part of your small intestine (duodenum) through a thin, flexible viewing instrument called an endoscope." http://www.webmd.com/digestive-disorders/upper-gastrointestinal-endoscopy.

complained of a knot on his left flank and was found to have a large grape-sized cyst diagnosed as a "Lipoma" (Tr. 272). Harrell returned to the clinic on December 7, 2009 with complaints of left sided pain and shortness of breath (Tr. 271). He reported that the cyst had become larger (Tr. 271). On March 17, 2010, Jim Allen, M.D. noted in his treatment notes that Harrell had been sent on his last visit to a general surgeon for evaluation of his Lipoma but he did not keep the appointment because it required a $204 co-pay (Tr. 267).

On June 23, 2010, James O. Colley, M.D., examined Harrell in connection with his application for benefits. Harrell's chief complaints were abdominal pain, low back pain, and bilateral knee pain. He reported that he underwent a partial gastrectomy for peptic ulcer disease in 1992, and had experienced stomach pain ever since (Tr. 223). He said that he injured his back at work 15 years previously, and his back pain was always present (Tr. 224). He complained of bilateral knee pain with swelling, with the right knee being worse than the left, and attributed his knee pain to a horse kicking his knee 10 years earlier (Tr. 224). He also complained of poor vision and reported that he needed glasses, but could not afford them (Tr. 224-25). Dr. Colley performed a Snellen's test[10] and reported Harrell's results as "[w]ithout lenses: Left 20/100; right: 20/200 [and] [w]ith pinhole: Left 20/70; right 20/200" Tr. 225). Dr. Colley further reported that Harrell "could see fingers correctly with his left eye from five feet away, but was unable to see

_____

[10] A Snellen's test is a "test for visual acuity using a Snellen chart." http://www.medical-dictionary.thefreedictionary.com/Snellen+test.

fingers correctly from five feet away with his right eye" (Tr. 225-226). Dr. Colley

diagnosed Harrell as having the following:

- Status post partial gastrectomy in 1992 for peptic ulcer disease complicated by occasional episodes of gastritis, doubt obstruction; possible right lower quadrant possible partial small bowel obstruction.

- Mild degenerative disk disease of the lumbosacral spine.

- Mild degenerative joint disease of the right knee.

- Poor visual acuity.

(Tr. 228).

The only Physical Residual Functional Capacity Assessment in the record, which

was completed by a physician, is the assessment by a non-examining state agency

physician, Gregory K. Parker, M.D., completed on July 7, 2010, based upon his review of

Harrell's medical records (Tr. 230-237). Dr. Parker concluded that Harrell could lift and

carry 20 pounds occasionally and 10 pounds frequently; sit about six hours in an eight-

hour workday; stand and/or walk about six hours in an eight-hour workday; frequently

balance and climb ramps and stairs; occasionally stoop, kneel, crouch, crawl, and climb

ladders, ropes, and scaffolds; never work in exposure to hazards; and never work in

concentrated exposure to environmental irritants (Tr. 230-32, 234). Dr. Parker also

indicated that Plaintiff could not obtain a driver's license, read normal print, or make

change because of his inability to accurately identify paper money. He found Plaintiff's

ability to do near work was limited to very gross tasks requiring handling of large objects

only (Tr. 233).

On July 26, 2010, Harrell underwent a consultative eye examination by Claiborne Callahan Moore, M.D.[11], who reported, in sum, that "with best correction" available, Harrell could attain a 20/25 in both the right and the left eyes (Tr. 242). Without correction, Dr. Moore reported that both Harrell's eyes were 20/200 (Tr. 242). He further reported that Harrell had "useful binocular vision in all directions" and had an excellent prognosis "with glasses" (Tr. 242, 243). Attached to this report are two test results , each of which the examiner reported to be "unreliable test; no pathology on exam to account for this result" (Tr. 245, 246). Although Dr. Moore recommended glasses, there is no evidence in the record that glasses were made available or that Harrell could afford to purchase them.

On June 10, 2011, Donald W. Blanton, Ph.D., examined Harrell at the request of his attorney (Tr. 281). Harrell's chief complaint when he presented to Dr. Blanton was "my stomach" (Tr. 281). He reported to Dr. Blanton that, since his 1992 stomach surgery, he could not hold food down and often threw up (Tr. 281). He also reported back and knee pain and that he received shots every six months for his back pain (Tr. 281). Harrell also advised Dr. Blanton that he had no money for the surgery to remove the knot of the left side of his body (the Lipoma) or to receive regular medical care (Tr. 281). Harrell also complained of depression that started after he had to stop working because of

---

[11] This name is obtained from the Index of Exhibits and the ALJ's opinion (Tr. 14) because no discernable name appears on the actual records (Tr. 242-246).

his physical problems (Tr. 281). Dr. Blanton reported that Harrell had a hard time describing his illness and problems, and "was not a particularly good historian" (Tr. 281). As to his personal and family history, Harrell did report that both of his parents died when he was a baby and he was raised by his grandparents (Tr. 281-82). He further reported that he had two siblings but that one had died of a heart attack in March of 2011, about three months prior to this examination (Tr. 282). Harrell told Dr. Blanton that he had stopped school in the eleventh grade, had worked cutting and planting grass on a golf course for about five years until about five or six years ago (Tr. 282). He reported having been married once, having four sons and one daughter, and being divorced for about 15 or 20 years (Tr. 282).

With respect to his daily activities, Harrell told Dr. Blanton that he lived with his ex-mother-in-law, cooked some light meals, did yard work slowly, had a driver's licence, and was able to shop and handle money (Tr. 282). He reported spending most of his day with his sons and dog (Tr. 282).

On examination, Dr. Blanton found that Harrell's thoughts and conversation were simple but logical, his associations were intact, and his affect was flat but appropriate (Tr. 282). He did not display any psychomotor retardation and there was no evidence of hallucinations, delusions, or persecutory type fears (Tr. 282). Although Dr. Blanton found Harrell to be alert and fully oriented, he observed that Harrell was a "somewhat anxious appearing man" (Tr. 282). Dr. Blanton also reported that Harrell was "depressed and he cries often" (Tr. 282). He further concluded that Harrell's "insight was limited and judgment was considered fair for work and financial type decisions" (Tr. 282).

Results of administration of the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) revealed a full scale Intelligence Quotient (IQ) of 60, indicating mild mental retardation; a Verbal Comprehension Index (VCI) (formally referred to as Verbal IQ), of 58; and a Perceptual Reasoning Index (PRI) (formerly referred to as Performance IQ), of 65 (Tr. 283).[12] Achievement testing showed Harrell's arithmetic skills were at the 4th grade level and his reading and spelling skills were at the 1st grade level (Tr. 283). Dr. Blanton did not perform the Minnesota Multiphasic Personality Inventory, due to Harrell's low intellect and poor reading ability (Tr. 284). Dr. Blanton did, however, perform the Beck Depression Inventory II by providing assistance in reading and reported Harrell's resolts as a total score of 26, which placed Harrell in the "moderately depressed range" (Tr. 284). Dr. Blanton opined that the "depression problems likely related to chrnic pain and illness" (Tr. 284).

Dr. Blanton's diagnostic impressions, in accordance with the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), included the following:

- AXIS I.    Pain Disorder With Depression.

- AXIS II.    Mild Mental Retardation.

- AXIS III.    Orthopedic Problems, GI Problems.

- AXIS IV.    Financial Problems

---

[12] Dr. Blanton reported that he felt Harrell's score on the WAIS-IV test was "a valid assessment of his current level of intellectual functioning as there were no distracting factors during the testing session and he appeared to put good effort into his work" (Tr. 284).

- AXIS V.  GAF 50.[13]

(Tr. 284).  Dr. Blanton also concluded that Harrell had marked limitations in

understanding, remembering, and carrying out detailed or complex instructions; using

judgment in detailed or complex work related decisions; and maintaining attention and

concentration and pace for a period of at least two hours (Tr. 284).  In Dr. Blanton's

opinion, Harrell's depression had been present at the observed level for at least one year

and his mental retardation has existed throughout his life (Tr. 285).  He also opined

that Harrell demonstrated deficits in adaptive functioning that manifested prior to age 22

in the areas of communication, self care, work, health safety, and functional academic

skills (Tr. 285).

3.  Vocational Expert's Testimony.

The ALJ asked the vocational expert, Michael McClanahan, Ph.D., to consider a

hypothetical individual with Harrell's vocational profile who was limited to jobs with an

SVP[14] of one or two that did not require reading or math calculations, who could lift 10

---

[13] The Global Assessment of Functioning (GAF) Scale describes the overall psychological, social, and occupational functioning resulting from mental illness, but without inclusion of any impaired functioning caused by physical or environmental limitations. A GAF score of 51-- 60 indicates moderate symptoms, or moderate impairment in these areas. Diagnostic and Statistical Manual of Mental Disorders, American Psychiatric Association, 4th ed.1994, at 32.  A global assessment of functioning score of 41-50 represents "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational or school functioning (e.g. no friends, unable to keep a job)." Id. at 32.  See also, http://www.gafscore.com.

[14] The Dictionary of Occupational Titles (DOT), in classifying each occupation, has a category captioned Specific Vocational Preparation (SVP) which "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles 1009 (4th ed. 1991).  The scale ranges from one to nine with level one requiring only a short (Continued)

pounds frequently and 20 pounds occasionally; sit for six hours in an eight-hour workday; stand and walk for four hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, and limb ramps and stairs; infrequently kneel, crouch, or crawl and who was color blind with poor visual acuity so could not read normal print or identify paper money, had to avoid hazards, vibration, and temperature extremes, and was limited to gross tasks with large items (Tr. 46-47). Dr. McClanahan testified that such an individual could not perform Harrell's past work, but could perform other unskilled light jobs, such as production assembler, electronics assembler, and electronics worker (Tr. 47-48).

4.    The Administrative Law Judge's Decision.

The ALJ found, in sum, that Harrell was not disabled under the Act (Tr. 7-24). She determined that he had severe impairments, including a history of partial gastrectomy, history of peptic ulcer disease with history of upper gastrointestinal bleed, mild degenerative changes of the lumbosacral spine and right knee, color blindness, and poor visual acuity correctable by glasses, but that his impairments did not meet or equal the criteria of any impairment listed at 20 C.F.R. pt. 404, subpt. P, app. 1 (the listings) so as to be per se disabling (Tr. 12). She then found that Harrell's subjective complaints were not fully credible and that he could perform work with limitations consistent with those the ALJ included in his hypothetical question to the vocational expert (Tr. 13) (compare

demonstration while a level nine occupation requires over ten years of preparation. *Id.* A surgeon has an SVP of 9 while a thread-pulling-machine attendant has an SVP of 1. *Id.* at 070.101-094, 689.686-046.

Tr. 13 with Tr. 46-47). Relying on the testimony of Dr. McClanahan, the vocational

expert's testimony, the ALJ found Harrell could not perform his past work, but could

perform other work existing in the national economy in significant numbers, such as

production assembler, electronics assembler, and electronics worker (Tr. 19-20). Thus,

the ALJ concluded that Harrell did not meet the Act's disability criteria, and denied his

claims (Tr. 20).

V.   Analysis

A.   **The ALJ erred in discounting the opinion of plaintiff's retained examining consultant, Donald W. Blanton, Ph.D.**

Plaintiff argues, in sum, that the ALJ erred in rejecting Dr. Blanton's opinion

because it was fully supported by the evidence of record and he was the only mental

health professional to examine Harrell and the ALJ may not arbitrarily reject

uncontroverted medical testimony.  (Doc. 13 at 3, *citing* Walden v. Schweiker, 672 F.2d

835, 839 (11th Cir. 1982) (*citing* Goodley v. Harris, 608 F.2d 234, 236 (5th Cir. 1979));

*see also*, Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (reversing a decision in

which the Administrative Law Judge rejected uncontradicted opinions from two

examining physicians finding that the claimant was totally disabled).  Dr. Blanton

examined and tested Harrell on June 10, 2011.  The IQ test revealed "a valid full

scale IQ score of 60 and reading and spelling on the first grade level (Tr. 283)."  Dr.

Blanton diagnosed "Mild Mental Retardation (Tr. 284)."  He also noted that Harrell

"demonstrated adaptive deficits in communication skills, self care skills, work skills,

health safety skills and functional academic skills (Tr. 285)."  Consequently, Harrell

further argues that the ALJ's failure to properly credit Dr. Blanton's opinion "resulted in her failure to include mild mental retardation as a severe impairment, her failure to include any mental limitations in the [RFC], and her failure to consider whether Mr. Harrell meets Listing 12.05C." (Doc. 13 at 4).

The Commissioner argues, in sum, that the ALJ properly rejected Dr. Blanton's opinion because he was not a treating physician and only met Harrell on one occasion "at the request of Plaintiff's attorney." The Commissioner also argues that Dr. Blanton's test results were acknowledged, but the ALJ "gave it very limited weight because it was not bolstered by the other evidence of record (Tr. 18)." The Commissioner further notes that the ALJ based her rejection of Dr. Blanton's opinion on her finding that Harrell "had a long work history beginning before the age of 22, . . . took care of himself, cooked meals, shopped, handled money and had a drivers license (Tr. 18)." The Commissioner further contends that the ALJ's rejection of Dr. Blanton's opinion is supported by the following:

- Dr. Blanton, himself, found that [Harrell] was fully alert and oriented and his thoughts and conversation were logical, his associations were intact, and his affect was appropriate (Tr. 282)."

- The ALJ not only concluded that "no other examining or treating physician noted any evidence of mental retardation" but that Harrell "displayed logical thoughts and conversations, and was consistently able to accurately describe his symptoms and report his medical history (Tr. 173-75, 186-87, 223-28, 267-69)."

(Doc. 16 at 11). The ALJ's rationale for rejecting Dr. Blanton's opinionincludes the following:

1.    Harrell saw Dr. Blanton on his attorney's referral to "generate evidence for the current appeal" and not for treatment.

2.      There is no documented treatment of Harrell for depression and "[his] activity level has not been significantly impaired by ay [sic] alleged depression."

3.      [Harrell is not mildly mentally retarded because he] "reported having an 11th grade education" and "School records do not indicate that [he] was in special education.  [His] grades were low and he repeated the ninth grade but the subjects taken included Biology, Science, and Algebra."

4.      "The record also shows a significant work history from 1975 to 2005 in the unskilled category with work activity at the substantial gainful level for many years.  [Harrell] testified that he cooked some light meals.  He has a driver's license and is able to shop and handle money."

(Tr. 18).

Although Harrell may have "reported" that he got to the 11th grade, there is no physical evidence that he did.  The only school records in evidence indicate that, in the 8th grade, he made an "A" in music but made a "D" in social studies and an "F" in English, math and science but was passed to 9th grade.  (Tr. 41, 168)  The records further reflect that, in the 9th grade, he made a "D" in social studies and an "F" in English, algebra and science and was made to repeat the 9th grade.  It appears from the records that Harrell dropped out of school during this repeat 9th grade since, in lieu of an actual grade, the school officials recorded only a zero ("0") as his subject "marks" (Tr. 41, 168).  In addition, the ALJ erred in concluding that there was no evidence that Harrell was in special education.  The records reflect that Harrell was given grades of "S" and "U" during the 7th grade.  (Tr. 41-42, 168).  During the August 10, 2011 hearing, the ALJ agreed that such scores were unusual in the 7th grade. (Tr. 41-42).  The ALJ also acknowledged that , when the grades changed to a scale from "A" to "F" in the 8th grade,

Harrell's grades "turned to Fs and Ds." (Tr. 42).[15]   In addition, no explanation is given

for the fact that the "Cumulative Record" form on which is recorded Harrell's

"Scholarship Record" sets forth the grading scale solely as:  A—Excellent, B—Good,

C—Fair, D—Poor, F—Failure, and I—Incomplete. (Tr. 168).   Grades of "S" and "U"

are not defined on this form. (Tr. 168).

While the fact that Harrell has not sought treatment for depression may weigh

against a finding of depression, Dr. Blanton's diagnosis was based on objective testing as

well as subjective observations.  *See*, Tr. 284 (discussion of results from the Beck

Depression Inventory II, which "placed [Harrell] in the moderately depressed range.")

The ALJ does not discuss or challenge this test.  It could also be reasoned that, inasmuch

as Harrell did not have the funds to obtain the prescription eyeglasses that could correct

his vision problems or obtain his prescription medication at times (Tr. 224-25, 267, 281),

his failure to seek mental health treatment is likely due more to his financial situation

than to a supposition that his depression is nonexistent.

Although the record may show "a significant work history from 1975 to 2005 in

the unskilled category," such work is not inconsistent with mild mental retardation and

---

[15] The Commissioner speculated at oral arguments that there may have been other school records from a different location and school, which would have been Harrell's obligation to produce.  This contention is, however, inconsistent with the ALJ's finding that Harrell had "a significant work history from 1975 to 2005" (Tr. 18).

can be said to have occurred before Harrell's other physical impairments became severe. *See also*, Tr. 116 (sets forth Harrell's annual earnings for 1975 to 2005).[16]

The ALJ may discount a medical source opinion for good cause where the medical source's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. *See* Holloman v. Colvin, 2013 WL 2903287, *6 (M.D. Ala. June 13, 2013), *citing* Schnorr v. Bowen, 816 F.2d 578, 581 (11th Cir. 1987). *See also* 20 C.F.R. §§ 404.1527(c)(4) (An ALJ must consider whether an opinion is consistent with the record as a whole). In this case, Dr. Blanton is the only mental health professional to examine Harrell. There is no other medical opinion in this record relating to Harrell's mental health status. Thus, Dr. Blanton's opinion is uncontroverted.

Additionally, the ALJ did not question the validity of the I.Q. score but essentially questioned the presence of adaptive deficits. The ALJ rejected Dr. Blanton's opinion that Harrell was mildly mentally retarded on the basis, it seems, that Harrell had an 11th grade education, was not in special education classes, took Biology, Science and Algebra and, thereafter worked many years in unskilled jobs. It is, however, obvious that Harrell was confused during his testimony about how far he had progressed in school (Tr. 40). The only school records in evidence show that he did not progress past his repeat of the 9th

---

[16] The most Harrell ever made was $14,790.75 in 1990. In 1975, he only earned $64. The next year he earned $182.10; then $658.46 in 1977. Thereafter, it was not until 1985 that his earnings rose to a high of $5,858.54. His annual salary exceeded $10,000 in only six of these "many years" of unskilled work, which included $10,021.08 in 1989, $14,790.75 in 1990 (followed by a drop to $1116 in 1991, only $673.76 in 1992 and $4762.56 in 1993), $10,225.49 in 1994 (following by income ranging from $3281.55 to $7668.22 between 1995 and 1999), $11906.17 in 2000, $11846.52 in 2001 and $10,906.25 in 2002. The last three years in which he was employed, he earned $280.43 in 2003, $43.75 in 2004, and $2770.44 in 2005. (Tr. 116).

grade first term and, although he took English, science/biology, and math/algebra classes, he failed all of them.

The ALJ also provided no basis for finding that mild mental retardation precludes the performance of unskilled work. The Social Security Regulations actually provide that an IQ of 60 is not itself expected to render an individual completely disabled; an additional impairment is required. (Listing 12.05C). *See also*, Durham v. Apfel, 34 F.Supp.2d 1373, 1380 (N.D. Ga. 1998)("Mr. Durham has worked primarily as a heavy laborer [and] [t]here is no evidence that these jobs are beyond the reach of a mildly retarded individual. The ALJ never asked the VE if Mr. Durham's work history was inconsistent with his low IQ."); Loveday v. Astrue, 2010 WL 4942740 at *16 (N.D. Fla. Oct. 22, 2010)(Plaintiff's work as a laborer, tile setter, and doing lawn work not inconsistent with diagnosis of mild mental retardation); Cobb v. Barnhart, 296 F.Supp.2d 1295, 1297-98 (N.D. Ala. 2003)(Plaintiff's work as a cement finisher, a car wash detailer, and a street sweeper not inconsistent with diagnosis of mild mental retardation). *See also*, Burgans v. Astrue, 2010 WL 1254299 at *6 (M.D. Ala. March 26, 2010)("The mere fact that Burgans held a job is, as a matter of law, insufficient to rebut the presumption that her subaverage intellectual functioning manifested before age 22."). *See*, Tr. 116 (Harrell's earning record).

Similarly, the ALJ's reliance on the fact that Harrell can prepare light meals, has a driver's license, is capable of shopping and handling money,[17] is insufficient grounds to reject Dr. Blanton's assessment. *See*, Alday v. Astrue, 2009 WL 347722, at *3-7 (N.D. Fla. Feb. 11, 2009)(Daily activities of having a boyfriend, caring for a dog, sweeping and doing some laundry, and walking grandchildren to school did not preclude finding of mild mental retardation), *citing* Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000)("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work."); Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997)("Nor do we believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability or is inconsistent with the limitations recommended by Lewis's treating physicians."); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986)(when considering daily activities, the entire record must be considered, including the claimant's testimony that she had to lie down after two hours of such work); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995)( the court must consider the entire record when determining whether the evidence of a claimant's daily activities is substantial evidence for the conclusion that she retains the residual functional capacity to work, and a conclusory citation to a claimant's "daily activities" as a basis for failing to believe her testimony as to pain was insufficient where there was a medical condition that

---

[17] *See* Tr. 282, in which Dr. Blanton reports: "He has a driver's license and is able to shop and handle money."

reasonably could have given rise to the pain described, and, although she testified that she cooked and shopped for herself, she had trouble putting on her clothing).

For these reasons, this action must be remanded for proper consideration of Dr. Blanton's opinion, unless the ALJ on remand determines that Harrell ought to be examined by an agency medical expert and submit to further testing.

B.    **The case must be remanded in order to determine whether Harrell's impairment met the requirements of Listing 12.05C.**

Listing 12.05C requires, "A valid verbal, performance or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." (20 CFR 404, Subpart P, Appendix 1, Listing 12.05C.)  In this case, Dr. Blanton administered objective IQ and academic achievement testing, finding a valid full scale IQ score of 60 and reading and spelling skills on the first grade level. (Tr. 283). Dr. Blanton diagnosed Mild Mental Retardation. (Tr. 284). He noted Mr. Harrell demonstrated adaptive deficits in communication skills, self care skills, work skills, health safety skills and functional academic skills. (Tr. 285).  For the reasons set forth with respect to the first issue, Harrell argues that the ALJ erred because "the evidence supports the presence of adaptive deficits."  (Doc. 13 at 4).

Harrell also argues that the second prong of Listing 12.05C is met because the ALJ found that Harrell had the following severe impairments: "history of partial gastrectomy; history of peptic ulcer disease with history of upper gastrointestinal bleed; mild degenerative disc disease of lumbosacral spine and right knee ; color blind; and poor visual acuity correctable by glasses." (Tr. 12).  The second prong of Listing 12.05(C)

requires "a physical or other mental impairment imposing additional and significant work-related limitation of function." A claimant satisfies the second half of listing 12.05C when the additional impairment's effect on "a claimant's ability to perform 'basic work activities' is more than slight or minimal … but less than 'severe.'" Edwards by Edwards v. Heckler, 755 F.2d 1513, 1515 (11th Cir. 1985), Edwards v. Heckler, 736 F.2d 625, 629 (11th Cir. 1984).

Although the ALJ acknowledged Dr. Blanton's diagnosis of mild mental retardation, she concluded that Harrell "had not shown deficits in adaptive functioning, as required to meet Listing 12.05 (Tr. 18)." (Doc. 16 at 13). The Commissioner argues that, based on the ALJ's discussion regarding Harrell's school record, even if deficits exists in adaptive functioning in the area of functional academic skills, "Plaintiff points to no evidence of deficits in any of the other skills areas." (Doc. 16 at 13). The Commissioner further argues that no such deficits exist because Harrell was able to "communicate his past medical history and his symptoms to his physicians, well enough to receive treatment," he performed his own self care, cooked meals, shopped, handled money, had a driver's license, spent time interacting with relatives, and married and had four children. Id. (record citations omitted). The Commissioner also cites to Harrell's "prior work experience." (Doc. 16 at 14).

For the reasons cited above with respect to the first issue in this case, the undersigned does not find that the ALJ properly rejected Listing 12.05C. However, remand would give the ALJ an opportunity to seek a consultative mental health examination to answer Dr. Blanton's assessment, which is the only assessment of

Harrell's mental health status in the record and not inconsistent with any other medical opinion.

CONCLUSION.

For the reasons stated above, the Court concludes that the decision of the Commissioner denying plaintiff's application for DIB and SSI benefits is not supported by substantial evidence and it is therefore **ORDERED** that the case **REMANDED** for proper consideration of Dr. Blanton's opinion, unless the ALJ on remand determines that Harrell ought to be examined by an agency medical expert and submit to further testing.

In light of the foregoing, and the plain language of sentence four of 42 U.S.C. § 405(g), the undersigned Magistrate Judge recommends that this cause be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings. See Melkonyan v. Sullivan, 501 U.S. 89, 99-102 (1991)(Discussing distinction between sentence four and sentence six remand under § 405(g)).[18]   A remand pursuant to

---

[18] The Supreme Court has held that 42 U.S.C. § 405(g) provides only two kinds of remands: "(1) remands pursuant to the fourth sentence, and (2) remands pursuant to the sixth sentence." Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991). "The fourth sentence of § 405(g) authorizes a court to enter 'a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing'." (*Id.*)  With respect to sixth sentence of § 405(g), the Supreme Court held:

> The district court does not affirm, modify, or reverse the Secretary's decision; it does not rule in any way as to the correctness of the administrative determination. Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding [and] . . . the Secretary must return to the district court to "file with the court any such additional or modified findings of fact and decision, and a transcript of the additional record and testimony upon which his action in modifying or affirming was based."

*Id.*, *quoting* 42 U.S.C. § 405(g), (internal citation omitted).

sentence four of § 405(g) makes the plaintiff a prevailing party for purposes of the Equal Access to Justice Act, 28 U.S.C. § 2412, and terminates this Court's jurisdiction over this matter. *See* <u>Shalala v. Schaefer</u>, 509 U.S. 292, 297 (1993)(A district court remanding a case pursuant to sentence four of § 405 must enter judgment in the case and may not retain jurisdiction over the administrative proceedings on remand.)

**DONE** this __6th__ day of December, 2013.

<u>/s/ Katherine P. Nelson</u>
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**